# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

**BENJAMIN W. COX,** )
    Plaintiff )
v. )  Civil Action No. 2:16cv00013
                    )  **MEMORANDUM OPINION**
**NANCY A. BERRYHILL,**[1] )
**Acting Commissioner of** )
**Social Security,** )
    Defendant )  By:  PAMELA MEADE SARGENT
                    )  United States Magistrate Judge

## *I. Background and Standard of Review*

Plaintiff, Benjamin W. Cox, ("Cox"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen,*

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Berryhill is substituted for Carolyn W. Colvin, the previous Acting Commissioner of Social Security.

829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Cox protectively filed applications for DIB and SSI on July 2, 2012, alleging disability as of April 27, 2012, due to hypothyroidism; diabetes; depression; social anxiety; obesity; swelling in the legs; right leg sciatic nerve problems; low back pain; osteoarthritis in the back; arthritis in the neck and hands; and liver problems. (Record, ("R."), at 232-37, 238-39, 253.) The claims were denied initially and on reconsideration. (R. at 80-91, 92-103, 104-16, 117-29, 136-38, 143-45, 149-51.) Cox requested a hearing before an administrative law judge, ("ALJ"), which was held on September 4, 2014, at which Cox was represented by counsel. (R. at 34-74, 166-67.)

By decision dated November 26, 2014, an ALJ denied Cox's claims. (R. at 17-33.) The ALJ found that Cox met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2017. (R. at 19.) The ALJ found that Cox had not engaged in substantial gainful activity since April 27, 2012, the alleged onset date. (R. at 19.) The ALJ found that the medical evidence established that Cox had severe impairments, namely insulin-dependent diabetes mellitus; low back pain; obesity; history of bilateral carpal tunnel and cubital tunnel syndrome, status-post bilateral surgical procedures; bilateral visual disorders, including nonproliferative diabetic neuropathy, bilateral cataracts, vitreous hemorrhage and

diabetic macular edema; inflammatory polyarthritis, not otherwise specified; and a combination of mental impairments with diagnoses of depressive disorder; anxiety disorder; and personality disorder, but she found that Cox did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19-22.) The ALJ found that Cox had the residual functional capacity to perform a limited range of simple, repetitive unskilled light work[2] that required lifting no more than 20 pounds maximally and 10 pounds frequently; that required no more than occasional pushing/pulling with the upper or lower extremities, climbing of ramps and stairs, balancing, kneeling, crawling, stooping, crouching or interacting with co-workers and supervisors; that required no more than frequent handling, feeling and fingering; that did not require concentrated exposure to extreme temperatures; that did not require working around hazardous machinery, unprotected heights or vibrating surfaces and that required no climbing of ladders, ropes and scaffolds, interaction with the public or reading of very small print. (R. at 22-25.) The ALJ found that Cox was unable to perform his past relevant work. (R. at 25.) Based on Cox's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Cox could perform, including jobs as an assembler, a packer and an inspector/tester/sorter. (R. at 25-26.) Thus, the ALJ concluded that Cox was not under a disability as defined by the Act, and was not eligible for DIB or SSI benefits. (R. at 26.) *See* 20 C.F.R. §§ 404.1520(g) 416.920(g) (2016).

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2016).

After the ALJ issued his decision, Cox pursued his administrative appeals, (R. at 8-11), but the Appeals Council denied his request for review. (R. at 1-7.) Cox then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2016). This case is before this court on Cox's motion for summary judgment filed October 27, 2016, and the Commissioner's motion for summary judgment filed December 28, 2016.

## II. Facts[3]

Cox was born in 1974, (R. at 232, 238), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a college education and past relevant work as a customer service representative, an information technology specialist and a retail sales associate. (R. at 254.) At his September 4, 2014, hearing, Cox testified that he last worked as a customer service representative in April 2012, but had to stop working due to his health, noting that he could not handle his pain, his anxiety was at an "extreme high," he was depressed, and he did not want to get out. (R. at 42-43.) He stated that he suffered from insulin-dependent type I diabetes and had been hospitalized once in 2007 with ketoacidosis. (R. at 44.) He stated that he had used an insulin pump since 2000, but that his sugar levels continued to fluctuate, going as high as 500 a couple of times weekly. (R. at 55-56.) He testified that he also took Metformin, which caused bowel issues and that he had to use to restroom six to 10 times over an eight-hour period due to diarrhea or other bowel problems. (R. at 62.) Cox further

---

[3] The relevant time period for deciding Cox's claims is from April 27, 2012, the alleged onset date, to November 26, 2014, the date of the ALJ's decision. To the extent that medical records outside the scope of the relevant time period are included herein, it is for clarity of the record.

stated that his diabetes caused frequent urinary urges, causing him to use the restroom three to four times in an eight-hour period. (R. at 61.)

Cox also stated that he suffered from diabetic retinopathy and macular edema, and he testified that he could not read small print. (R. at 45.) However, he stated that he did not wear reading glasses or contact lenses and that his ability to watch television was "fairly decent." (R. at 45.) He testified that he had spondylosis of the back, but had been diagnosed with only low back pain. (R. at 45.) Cox stated that he underwent surgery for carpal tunnel syndrome in 2011 and that he continued to experience swelling, numbness and tingling of the hands. (R. at 46.) Nonetheless, he testified that he was not then receiving any treatment for this condition. (R. at 46.) Cox testified that the hand swelling caused difficulty gripping and grasping objects. (R. at 57-58.) He described the sensation in his hands as "needles" and "bee stings." (R. at 58.) Cox testified that he had neuropathy in his feet and that he tried to stay off of them and keep them elevated three to four hours throughout the day. (R. at 46-47.) He stated that he had been doing this since May or June 2012. (R. at 47.) He stated that the sensation in his feet was similar to that in his hands, but he also had a burning sensation. (R. at 58.) Cox stated that he could not take anything for pain other than Tylenol because he was in renal failure, for which he had been treated since 2009 or 2010. (R. at 48.) Cox stated that he had been told to cut back on the amount of protein in his diet and to only take Tylenol. (R. at 49.) Cox testified that a kidney specialist had advised to "keep a close eye and monitor[] it." (R. at 49.)

Cox further testified that he suffered from depression, for which he had never been hospitalized. (R. at 49, 54.) He testified that the last time he took mental health medications was in April 2012 because he could not afford them.

(R. at 54-55.) He stated that he had been in counseling since 2010. (R. at 43, 60.) Cox stated that he had anxiety or panic attacks, during which his heart raced and he did not want to be around people. (R. at 59.) He stated that he left his home "very rarely," noting that he usually stayed in his bedroom "resting or something." (R. at 59.) He described his depressive symptoms to include tiredness, increased appetite, feeling really sad, crying a lot and having no motivation to get out of bed. (R. at 59.) Cox noted that four or five times weekly he would not get out of bed to shower and dress. (R. at 59-60.) Cox stated that, in April 2012, he was experiencing a lot of work-related stress, noting that breaks were being taken away, and he was allowed only a lunch break in a 10-hour period. (R. at 61.) He further stated there was a lot of negativity. (R. at 61.)

Cox testified that he had lived with his parents since losing his house in November 2012. (R. at 52.) He stated that he usually stayed home, sitting around or lying in bed. (R. at 51-52.) Cox stated that he took care of a fish aquarium, but a friend bought the supplies for him. (R. at 52.) He denied performing any household activities due to pain in his low back, legs and knees. (R. at 53.) Cox further testified that he became short of breath with exertion, estimating he could walk 20 feet before becoming short of breath, stand for 10 minutes and sit for about 20 minutes. (R. at 53-54.) Cox estimated that he could lift five pounds. (R. at 54.) He testified that being on his feet too long caused low back pain, and if he did not sit down, his legs got weak and shaky. (R. at 56-57.) He also stated that his feet would swell after being on them for five to 10 minutes and that he suffered swelling in his legs and ankles daily, all as a result of his improperly functioning kidneys. (R. at 57.) Cox testified that bending at the waist was "extremely painful" and that stooping, squatting and kneeling were "very difficult," as they increased his pain, and he had to pull himself back up. (R. at 58-59.)

Vocational expert John Newman also was present and testified at Cox's hearing. (R. at 64-72.) Newman classified Cox's past work as a customer service representative as sedentary[4] and semi-skilled, as a retail sales associate, as performed by Cox, as medium[5] and unskilled and as an information technology specialist as medium and skilled. (R. at 66.) Newman was asked to consider a hypothetical individual such as Cox, who could perform simple, repetitive unskilled work that required lifting and carrying no more than 20 pounds occasionally, up to 10 pounds frequently, standing, walking and sitting up to six hours in an eight-hour day, occasionally pushing and pulling with the upper and lower extremities to the lift/carry amounts, occasionally climbing ramps and stairs, balancing, kneeling, crawling, stooping and crouching, frequently handling, feeling and fingering objects, who needed to avoid concentrated exposure to extreme temperatures, hazardous machinery, unprotected heights, climbing ladders, ropes and scaffolds and working on vibrating surfaces, who could have no interaction with the general public and no more than occasional interaction with supervisors and co-workers and who would have to avoid reading very small print. (R. at 66-67.) Newman testified that such an individual could not perform Cox's past relevant work, but could perform other jobs existing in significant numbers in the national economy, including those of an assembler, a packer, a laundry folder and an inspector/sorter. (R. at 67-68.) Newman testified that the same hypothetical

---

[4] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2016).

[5] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can perform medium work, he also can perform sedentary and light work. *See* 20 C.F.R. §§ 404. 1567(c), 416.967(c) (2016).

individual, but who would miss more than two workdays monthly, could not perform any work due to an unacceptable rate of absenteeism. (R. at 68-69.) Newman next testified that the individual in the first hypothetical, but who would be limited to handling and fingering objects less than one-third of an eight-hour workday due to diabetic neuropathy and carpal tunnel symptoms, could not perform any work. (R. at 69-70.) Newman next testified that the first hypothetical individual, but who was seriously limited in the ability to deal with work stresses, functioning independently and demonstrating reliability, could not perform competitive employment. (R. at 70-71.) Next, Newman testified that an individual with the restrictions set out in Paula Meade's May 25, 2014, physical assessment, with the exception of a changed restriction from an ability to never climb, stoop, kneel, crouch and crawl to an ability to rarely perform these activities and an ability to occasionally balance, could not perform any jobs. (R. at 71.) Lastly, Newman testified that an individual who would be off-task greater than 10 percent of the workday could not maintain substantial gainful activity. (R. at 72.)

In rendering her decision, the ALJ reviewed records from Wellmont Health System; Clinch Valley River Health Services; Lonesome Pine Hospital; Holston Medical Group; Holston Valley Ambulatory Surgery Center; Anne B. Jacobe, LCSW; Solutions Counseling; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Dr. Matthew Beasey, M.D.; Holston Valley Medical Center; Wise County Social Services; The Regional Eye Center; Paula Meade, FNP; Karen Odle, LPC; Mary Beth Bentley, FNP; The Health Wagon; Dr. Andrew Bockner, M.D., a state agency physician; Dr. Richard Surrusco, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; and Dr. R.S. Kadian, M.D., a state agency physician.

As for Cox's alleged physical impairments, by way of background, the record reveals that he has been treated for type I diabetes since he was nine years old. (R. at 696.) He also has undergone numerous diagnostic tests, including x-rays of the cervical spine, taken on January 25, 2010, which showed no significant degenerative changes, and x-rays of the lumbar spine, dated February 24, 2010, which showed mild degenerative spondylosis, but no acute abnormality. (R. at 1277, 1297.) These lumbar x-rays also showed slight wedging of the T11 and T12 vertebral bodies. (R. at 1277.) An MRI of the lumbar spine, dated February 26, 2010, showed T11 and T12 compressions and degenerative changes, but no definite neural impingement. (R. at 1272-73.) An MRI of the thoracic spine, dated March 17, 2010, showed mild compression deformities of the T11 and T12 levels of the spine, which appeared to be chronic, but no acute abnormality was evident. (R. at 1264.) An MRI of the lumbar spine, dated December 15, 2010, showed mild lumbar spondylosis without significant interval change. (R. at 1182-83.) An ultrasound of the abdomen, also dated December 15, 2010, showed echogenic liver, consistent with steatosis.[6] (R. at 1188.) An August 25, 2011, abdominal CT scan showed progression in hepatomegaly and hepatic steatosis, but stable splenomegaly; atrophy of the medial segment of the left lobe of the liver and caudate lobe, of unclear significance; and age-advanced pancreatic atrophy. (R. at 1101, 1567.) August 26, 2011, x-rays of the cervical spine were normal. (R. at 1099.) Based on Cox's complaints of headaches, a CT scan, taken on September 2, 2011, strongly suggested chronic bilateral mastoiditis and chronic otitis media, but, otherwise, was unremarkable. (R. at 1093.) A CT guided liver biopsy, performed on October 31, 2011, revealed findings consistent with hepatic steatohepatitis/fatty liver disease. (R. at 936-38.)

_____

[6] Steatosis refers to fatty degeneration. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1579 (27th ed. 1988).

The record also shows that Cox treated his diabetes, hypothyroidism, hypertension and hyperlipidemia with Holston Medical Group from January 3, 2012, to April 20, 2012. Over this time, some mild edema of the lower extremities was noted, but Cox consistently had a normal gait and normal strength and muscle tone in the extremities, as well as normal foot examination. (R. at 754, 819, 830, 870, 882, 886.) Cox was obese, with his weight during this time period recorded as being from 298 to 307 pounds. (R. at 753, 819, 830, 869, 886, 893.) Blood pressure readings were 172/86, (R. at 893), 148/76, (R. at 830), 138/82, (R. at 886), 160/90, (R. at 881), 122/82, (R. at 819), and 140/80. (R. at 869.) He denied symptoms of peripheral neuropathy, gastrointestinal complaints and numbness and tingling in the legs. (R. at 753, 827-28, 881, 883.) Over this time, Cox did complain of stress, headaches, right hip pain and some back pain. (R. at 883, 886, 893.) On March 8, 2012, Cox received injections for lower back and hip pain. (R. at 887-88.) X-rays of the hips were mostly unremarkable, and x-rays of the lumbar spine showed only mild spondylosis, mild compression deformity at the T12 vertebra, minimal discogenic abnormalities at the L3-L4 and T11-T12 levels of the spine and mild anterior wedging of the T11 vertebra. (R. at 889, 891.) Cox reported more than once that he was not taking his medications as directed. (R. at 828, 883.) He reported that he was doing well with CPAP treatment. (R. at 866, 893.) Over this time, Cox was consistently alert and oriented with a normal mood and affect, as well as intact insight and judgment. (R. at 754, 830, 882, 886, 894.) On January 3, 2012, Dr. Michael Nannenga, M.D., noted that Cox had diabetic nephropathy, but on March 22, 2012, hepatic function testing was normal. (R. at 755, 828.) On March 30, 2012, Cox's microalbumin levels and microalbumin/creatinine ratio were high, but TSH levels were normal. (R. at 913, 921.) Cox was diagnosed with diabetic nephropathy, hypertension, hyperlipidemia, hypothyroidism, elevated liver enzymes, nonalcoholic steatohepatitis, microalbuminuria, uncontrolled type I

diabetes, neuropathy, neck pain, migraine headaches, hip pain, sciatica and lower back pain. (R. at 754, 820, 831, 887.) Cox was continued on medications and advised to exercise and lose weight. (R. at 754, 821-22, 831-32, 870.) On April 20, 2012, Cox reported that he would be looking for a new job because his employer would not accommodate his limitations due to diabetes and severe sleep apnea. (R. at 866.)

Cox saw Paula Hill Meade, FNP at The Health Wagon, to establish his status as a new patient, on October 1, 2012. (R. at 1543-45.) His nonfasting blood sugar level was 261. (R. at 1544.) On examination, Cox was pleasant, cooperative and in no acute distress. (R. at 1544.) He exhibited some elbow tenderness and right hip tenderness with painful range of motion of the hip. (R. at 1544.) There was no clubbing, cyanosis or edema of the extremities, and peripheral pulses were within normal limits. (R. at 1544.) Cranial nerves were grossly intact, and Cox was alert and oriented with good eye contact and clear speech. (R. at 1544.) The remainder of the examination was normal, including a foot exam. (R. at 1544.) Cox reported that he had been without all medications since May, except for Synthroid and insulin. (R. at 1544.) While he reported arthritic pain in his upper extremity joints, he noted that he responded well to Mobic. (R. at 1544.) Meade diagnosed Cox with benign essential hypertension, diabetes, not stated as uncontrolled, and generalized osteoarthritis. (R. at 1544.) She prescribed Lisinopril and Mobic. (R. at 1544.) On October 18, 2012, Cox saw Teresa Gardner, another FNP at The Health Wagon, for a follow-up appointment. (R. at 1541-42.) His blood pressure was 147/81, he weighed 314 pounds, and his nonfasting blood sugar level was 262. (R. at 1541.) Cox reported painful upper extremity joints and neck pain due to not taking Mobic because of lack of resources. (R. at 1541.) On physical examination, Cox was pleasant, cooperative and in no acute distress. (R. at 1541.) Frontal and maxillary

sinuses were tender to percussion, and he exhibited right elbow and right hip tenderness with painful range of motion of the hip, but there was no clubbing, cyanosis or edema of the extremities, and peripheral pulses were within normal limits. (R. at 1541.) Cox was alert and oriented with grossly intact cranial nerves, he made good eye contact, and he had clear speech. (R. at 1541.) Cox was diagnosed with diabetes, not stated as uncontrolled, and acute sinusitis. (R. at 1542.) When Cox returned to Gardner on November 12, 2012, his blood pressure was 156/84, he weighed 313 pounds, and his nonfasting blood sugar level was 232. (R. at 1539.) Gardner encouraged Cox to lose weight. (R. at 1539.)

On December 6, 2012, Dr. Richard Surrusco, M.D., a state agency physician, completed a physical residual functional capacity assessment of Cox, finding that he could perform light work with a limited ability to frequently push/pull with the upper extremities. (R. at 87-89.) Dr. Surrusco found that Cox could occasionally climb ladders, ropes or scaffolds, but could perform all other postural activities frequently. (R. at 87-88.) He further opined that Cox was limited to handling objects frequently with both hands. (R. at 88.) He indicated no visual or communicative limitations, but found that Cox must avoid concentrated exposure to vibration, fumes, odors, dusts, gases, poor ventilation and hazards. (R. at 88-89.) Dr. Surrusco concluded that Cox could perform his past relevant work as a dispatcher. (R. at 91.)

Cox continued to treat with various healthcare providers at The Health Wagon through June 5, 2013. Over this time, his blood pressure readings were 190/90, 149/72 and 163/88, and his nonfasting blood sugar levels were 187, 224 and 126. (R. at 1522, 1525, 1534.) Cox continued to lose weight during this time, with a recorded weight of 307 pounds on June 5, 2013. (R. at 1522.) Physical

examinations were essentially normal, except for tenderness to percussion of the frontal and maxillary sinuses, bilateral elbow tenderness and right hip tenderness with painful range of motion. (R. at 1522, 1525, 1534.) There was no clubbing, cyanosis or edema of the extremities, peripheral pulses were normal, cranial nerves were grossly intact, and Cox exhibited good eye contact and clear speech. (R. at 1522, 1525-26, 1534.) On June 5, 2013, a foot examination was normal. (R. at 1522.) Over this time, Cox was diagnosed with diabetes without mention of complication and not uncontrolled; unspecified essential hypertension; chronic nonalcoholic liver disease; hypothyroidism; acquired trigger finger; unspecified tachycardia; unspecified hematuria; and proteinuria. (R. at 1522, 1526, 1535.) Cox was continued on medications and advised to lose weight. (R. at 1523, 1535.)

Dr. R.S. Kadian, M.D., a state agency physician, completed another physical residual functional capacity assessment of Cox on June 14, 2013. (R. at 112-13.) His assessment mirrored that of Dr. Surrusco from December 4, 2012, except he found that Cox had no environmental limitations. (R. at 112-13.) Dr. Kadian concluded that, despite his limitations, Cox could perform his past work as a dispatcher. (R. at 114.)

On July 3, 2013, Cox returned to The Health Wagon, complaining of worsened thyroid symptoms over the previous three to four weeks, including crying spells, nightmares, temperature sensitivity, low energy and depressed mood. (R. at 1520.) He reported that he had discontinued his thyroid medications approximately six weeks previously for one to two weeks, and he noted that he would run out of medications soon, but had no money to obtain refills. (R. at 1520.) Cox reported fatigue, blurred vision in the right eye, shortness of breath with exertion, painful shoulder, neck, low back, knees and hips, decreased

sensation in the extremities with tingling, numbness and burning in the feet related to position, a burning sensation in the liver after meals and back pain with walking, which had worsened over the previous three to four weeks. (R. at 1521.) On examination, Cox was pleasant and cooperative and in no acute distress. (R. at 1520.) He exhibited bilateral elbow tenderness and tenderness of the right hip with painful range of motion of the hip, but there was no clubbing, cyanosis or edema of the extremities, and peripheral pulses were normal. (R. at 1520.) Gardner diagnosed unspecified hematuria and unspecified hypothyroidism. (R. at 1520.) On October 18, 2013, Cox saw Becky Mullins, a nurse practitioner at The Health Wagon, at which time his blood pressure was 148/89, he weighed 329 pounds, and his fasting blood sugar level was 151. (R. at 1515.) Cox reported no changes since his prior visit other than increased fatigue. (R. at 1516.) He further reported blood sugar levels from the 120s to 150s, with no significant highs or lows. (R. at 1516.) He denied blurred vision, diminished visual acuity or floaters, cold intolerance, difficulty sleeping, dizziness, excessive sweating or thirst, frequent urination, heat intolerance, shortness of breath with rest or exertion, fluid accumulation in the legs, abdominal pain and swollen joints. (R. at 1516.) Cox did complain of painful joints, lower back pain and stiffness, but he denied decreased extremity sensation, foot pain, leg pain or cramping, ulceration of the feet, difficulty walking, foot pain, gait abnormality, headache, irritability, loss of strength, memory loss, tingling and numbness. (R. at 1516-17.) Cox also denied anxiety, depressed mood, eating disorder, loss of appetite, stressors and suicidal thoughts. (R. at 1517.) On examination, Cox was pleasant, alert and in no acute distress. (R. at 1515.) He had full range of motion of the neck, a normal spine examination, no lumbosacral tenderness, no clubbing, cyanosis or edema of the extremities, normal peripheral pulses, normal gait and normal motor strength in all extremities. (R. at 1515.) He was alert and oriented with intact cognitive function, good eye contact, good

insight and judgment, clear speech, thought content free of suicidal ideation or delusions and logical and goal-directed thought processes. (R. at 1515.) Mullins diagnosed Cox with benign essential hypertension, diabetes, not stated as uncontrolled, and unspecified hypothyroidism. (R. at 1515.) His medications were refilled, and he was advised to start a diet and exercise regimen. (R. at 1516.)

Cox presented to the emergency department at Lonesome Pine Hospital on October 28, 2013, with complaints of seeing red spots with his right eye with no history of injury. (R. at 1432-42.) He denied eye pain, but noted blurred vision of the right eye. (R. at 1434.) Cox appeared uncomfortable, but alert and in no acute distress. (R. at 1435.) No hemorrhages were noted, and there was no corneal abrasion or foreign body. (R. at 1435.) Cox exhibited no extremity tenderness or edema, and his mood and affect were normal. (R. at 1435.) Cox was diagnosed with eye floaters. (R. at 1437.) A CT scan of the head was performed, and Cox was referred to an ophthalmologist. (R. at 1435.)

Cox continued to receive treatment at The Health Wagon from December 3, 2013, to March 4, 2014. His blood pressure readings over this time were 142/85, 157/93 and 139/84, and his blood sugar levels were 183, 271, 253 and 510.[7] (R. at 1502, 1504, 1506, 1513.) Cox's weight ranged from 321 to 333 pounds. (R. at 1502, 1504, 1506, 1513.) When Cox saw Mary Beth Bentley, FNP, on January 20, 2014, he did not report any symptoms, including depression or anxiety, and he was in no acute distress. (R. at 1508-09.) A physical examination was unremarkable, including a full range of motion of the neck, no extremity edema, normal motor strength and normal sensory exam. (R. at 1508.) Cox was alert and oriented with intact cognitive function, good eye contact, good judgment and insight, clear

---

[7] The 183 and 510 readings were fasting levels, while the other two were nonfasting.

speech, thought content free of suicidal ideation or delusions and logical and goal-directed thought processes. (R. at 1508.) A physical examination on February 3, 2014, yielded the same results. (R. at 1506.) On February 25, 2014, Cox had trace edema to the legs, but he reported that he had run out of insulin. (R. at 1504.) The rest of the physical examination was unremarkable, and a mental status examination also was normal, including intact cognitive function, good judgment and insight, full range mood and affect, no hallucinations, no suicidal ideation or delusions and logical and goal-directed thought processes. (R. at 1504.) Over this time, Cox was diagnosed with diabetes; unspecified essential hypertension; nonspecific abnormal liver function study results; mixed hyperlipidemia; and hypothyroidism. (R. at 1504-06, 1508.) He was continued on medications and advised to lose weight. (R. at 1505-06, 1508-09.)

Meade completed a letter, dated April 17, 2014, on behalf of the Wise County Department of Social Services, finding that Cox was permanently disabled due to diabetes mellitus with nephropathy, hypertension and hypothyroidism. (R. at 1398.) Cox continued to see Meade in April and May 2014. Over this time, his blood pressure was 139/83 and 132/81, and his nonfasting blood sugar level was 262 and 219. (R. at 1495, 1497.) He weighed 317 to 319 pounds. (R. at 1495, 1497.) During this time, Cox had normal physical examinations, with the exception of trace edema to the legs. (R. at 1495, 1497.) Mental status examinations were unremarkable. (R. at 1495, 1497.) On April 22, 2014, a foot examination also was normal. (R. at 1497.) On May 6, 2014, Cox reported that his disability application had been denied the previous week, he was going to run out of his medications, and he was extremely stressed. (R. at 1495.) Cox's diagnoses remained the same, and he was continued on medications. (R. at 1497-98.)

Meade completed a physical assessment of Cox on May 25, 2014, finding that he could lift and/or carry items weighing up to 10 pounds occasionally and up to five pounds frequently due to a history of chronic low back pain. (R. at 1456-58.) She further found that he could stand and/or walk for a total of 30 minutes in an eight-hour workday, but could do so for only 15 minutes without interruption, noting that his history of diabetic neuropathy prevented prolonged sitting or prolonged walking. (R. at 1456.) Likewise, Meade found that Cox could sit for a total of 30 minutes in an eight-hour workday, but could do so for only 15 minutes without interruption due to obesity, chronic low back pain and diabetic neuropathy. (R. at 1457.) She found that he could never climb, stoop, kneel, balance, crouch or crawl due to his chronic lumbago and diabetic neuropathy. (R. at 1457.) Meade found that Cox's abilities to reach, to handle, to feel, to push/pull, to see and to speak were affected by his impairments due to his diabetic retinopathy and a visual disturbance of the left eye due to hemorrhage. (R. at 1457.) She found that Cox could not work around moving machinery, temperature extremes, chemicals, dust, fumes and humidity. (R. at 1458.) She attributed these restrictions to Cox's history of sleep apnea and breathing difficulties. (R. at 1458.) She also noted that Cox's neuropathic pain was increased. (R. at 1458.) Meade opined that Cox would miss more than two workdays monthly. (R. at 1458.)

Cox continued to treat at The Health Wagon through August 21, 2014. On May 28, 2014, Cox reported continued spots before his eyes and floaters and a history of diabetic neuropathy with increased pain and burning in the lower extremities, which he rated as a 10 on a 10-point scale. (R. at 1492.) He reported fever, lightheadedness and sleep disturbance. (R. at 1493.) On examination, Cox was alert and in no distress, and there was no clubbing or cyanosis of the extremities, but trace edema to the legs, and peripheral pulses were normal

throughout. (R. at 1492.) He had a normal gait and normal extremity motor strength. (R. at 1492.) Cox was alert and oriented with intact cognitive function, good eye contact, good judgment and insight, full range mood and affect, no auditory or visual hallucinations, clear speech, thought content free of suicidal ideation or delusions and logical and goal-directed thought processes. (R. at 1492.) In addition to his previous diagnoses, Cox was diagnosed with diabetes with neurological manifestations, and he was advised on foot care. (R. at 1492.) Cox's blood pressure readings over this time were 143/84, 124/81 and 135/76, and his blood sugar levels were 412, 123 and 209.[8] Cox's weight ranged from 317 to 320 pounds. (R. at 1484, 1487, 1490.) On June 24, 2014, Cox reported that his blood sugar had been well-controlled with no significantly high readings, and he reported well-controlled blood pressure. (R. at 1488.) At that time, he complained of low back pain at times, as well as tingling and numbness, but he denied all other symptoms, including anxiety, depressed mood and suicidal thoughts. (R. at 1488.) Physical examination, as well as mental status examination, were completely unremarkable. (R. at 1487.) Cox was continued on medications. (R. at 1487-88.)

On August 21, 2014, Bentley completed a mental assessment of Cox, finding that he had a good ability to understand, remember and carry out simple job instructions, to maintain personal appearance and to behave in an emotionally stable manner. (R. at 1478-80.) She opined that Cox had a fair ability to follow work rules, to relate to co-workers, to use judgment, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out both detailed and complex job instructions and to demonstrate reliability. (R. at 1478-79.) She found that he had a fair to poor ability to relate predictably in social situations and a poor ability to deal with work

_____

[8] The 209 reading was the only nonfasting level.

stresses due to poor coping abilities and a poor ability to deal with the public. (R. at 1478-79.) She found that Cox would miss more than two workdays monthly. (R. at 1480.) Bentley based these findings on Cox's allegations of having a poor rapport with co-workers, social anxiety, prior increased hostility and antisocial behavior in social situations. (R. at 1478-79.) She further noted that Cox's various health issues compromised his ability to work and participate in social activities. (R. at 1480.) On this same day, Bentley opined that Cox's condition met or equaled § 6.02(C)(2) of the Listing of Medical Impairments for impaired renal functioning. (R. at 1482.)

Cox received treatment at The Regional Eye Center from October 2013 through July 2014. (R. at 1400-15, 1444-48, 1470-76.) Cox saw Dr. Eric K. Smith, M.D., on October 29, 2013, following an emergency room visit the previous evening due to the sudden appearance of a black spot in the central vision of his right eye. (R. at 1413.) Cox advised Dr. Smith that this had worsened since the prior evening and that his peripheral vision had begun to decrease. (R. at 1413.) Dr. Smith diagnosed Cox with background diabetic retinopathy in both eyes with vitreous hemorrhage of the right eye and cataracts in both eyes. (R. at 1414.) By November 26, 2013, visual acuity was 20/50 in the right eye and 20/25 in the left. (R. at 1411.) Dr. Smith noted improving hemorrhage in the right eye, and he referred Cox to Dr. Williamson for a panretinal photocoagulation, ("PRP"), evaluation. (R. at 1412.) Cox saw Dr. Keith Williamson, M.D., on January 7, 2014, noting no changes in his condition. (R. at 1408.) Visual acuity in the left eye was improved to 20/20, but there continued to be hemorrhage in the right eye. (R. at 1409.) Dr. Williamson diagnosed proliferative diabetic retinopathy of the right eye with hemorrhage and nonproliferative diabetic retinopathy of the left eye. (R. at 1409.) Dr. Williamson performed a PRP treatment on the right eye and advised

that, if this did not resolve the problem, he would refer Cox for retinal injections. (R. at 1409.)

On February 26, 2014, Cox reported that his vision was some better, but he continued to see a few spots and a lot of floaters. (R. at 1406.) Fresh vitreous hemorrhage was discovered on examination. (R. at 1407.) Dr. Williamson scheduled Cox for the second half of the PRP treatment. (R. at 1407, 1447.) On March 27, 2014, Cox reported continued, but improved, spots. (R. at 1403.) He reported that his right eye became "hazier" as the day progressed and that it was very sensitive to light. (R. at 1403.) Cox's visual acuity was 20/50 in the right eye and 20/25 in the left. (R. at 1403.) An early cataract was noted in the right eye, along with fresh vitreous hemorrhage. (R. at 1404.) Dr. Williamson diagnosed mild nonproliferative diabetic retinopathy in the left eye, but moderate diabetic proliferative retinopathy in the right eye. (R. at 1404.) On May 5, 2014, Cox's visual acuity remained unchanged, an early cataract was noted in the right eye, and there was a small amount of hemorrhage in the right eye. (R. at 1400-01.) Moderate proliferative diabetic retinopathy with mild edema in the right eye also was noted. (R. at 1401.) Cox agreed to undergo an evaluation for retinal injections. (R. at 1401.)

On June 2, 2014, Cox saw Dr. Brandon Lee, M.D., who recommended intravitreal injections for three months to try to improve his vision. (R. at 1445.) Examination showed a small amount of hemorrhage, moderate proliferative diabetic retinopathy of the right eye and cataracts in both eyes, but which were not affecting his vision. (R. at 1445.) On July 22, 2014, Dr. Williamson performed the retinal injection. (R. at 1472-74.) Cox complained of experiencing random right eye pain and distorted and blurry vision in the right eye, and he reported difficulty

reading fine print. (R. at 1472.) There was a small amount of hemorrhage. (R. at 1473.) Dr. Williamson diagnosed diabetic macular edema. (R. at 1473.) Although Cox returned for another retinal injection on August 19, 2014, Dr. Lee found that Cox's vision and edema had improved. (R. at 1550-52.) Therefore, no injection was administered. (R. at 1552.)

As for Cox's mental health treatment, the record shows that he received counseling at Solutions Counseling from June 2010 to August 2012 for his symptoms of depression. On January 5, 2012, Cox reported moderate depression, anxiety, irritability and anger and panic attacks, as well as mildly decreased attention and concentration, but no crying spells or suicidal ideation. (R. at 978.) On mental status examination, Anne Jacobe, a licensed clinical social worker, found that Cox had a depressed and irritable mood with anxious affect, but intact orientation and thought process, no paranoia/delusions and fair insight and judgment. (R. at 978.) Jacobe diagnosed Cox with moderate, recurrent major depressive disorder and agoraphobia with panic attacks. (R. at 978.) By January 18, 2012, Cox reported "doing some better." (R. at 977.) He continued to report moderate depression and anxiety and mildly decreased concentration, but no irritability/anger, no panic attacks, no crying spells and no suicidal or homicidal ideation. (R. at 977.) Jacobe found that Cox had a depressed mood and anxious, but appropriate, affect, intact orientation, racing thoughts, no paranoia/delusions and fair judgment/insight. (R. at 977.) On January 31, 2012, Cox continued to report moderate depression and anger and moderately decreased attention and concentration, but he denied anxiety, panic attacks and suicidal or homicidal ideation. (R. at 976.) Jacobe found that Cox's mood was depressed and irritable, but orientation and thought process were intact, he had no paranoia/delusions, and judgment/insight was good. (R. at 976.) On February 16, 2012, Cox again reported

"doing some better," noting decreased stress at work. (R. at 975.) He continued to report moderate depression, anxiety and irritability, moderately decreased attention and concentration, but no crying spells, panic attacks or suicidal or homicidal ideation. (R. at 975.) Jacobe found that Cox had an irritable mood and anxious affect with intact orientation and thought process, no paranoia/delusions and fair judgment/insight. (R. at 975.) On March 15, 2012, Cox reported increased stress. (R. at 973.) On mental status examination, Jacobe found that Cox had a depressed mood and anxious affect, but intact orientation and thought process. (R. at 973.) On March 29, 2012, Jacobe found that Cox had a depressed and irritable mood with an anxious affect and racing thoughts, but intact orientation, no paranoia/delusions and fair judgment/insight. (R. at 972.) Cox reported "doing some better" when he saw Jacobe on April 12, 2012. (R. at 971.) However, he noted continued work stressors. (R. at 971.) He had an anxious affect, but intact orientation and thought process, no paranoia/delusions and fair insight and judgment. (R. at 971.) On April 25, 2012, Cox reported increased work stressors and reported working 50 hours weekly. (R. at 970.) Cox reported moderate depression and panic attacks. (R. at 970.) Jacobe found that Cox had a depressed mood and anxious affect, but intact orientation and thought process, no paranoia/delusions and fair judgment/insight. (R. at 970.)

On May 18, 2012, Cox reported that he had quit his job earlier in the week and planned to file for disability benefits. (R. at 969.) He stated, "I couldn't take it," and he noted he planned to sue his employer for failing to accommodate his health issues. (R. at 969.) Cox reported moderate depression, anxiety and anger, but no crying spells or panic attacks and "ok" attention/concentration. (R. at 969.) Jacobe found that Cox had a depressed and irritable mood with anxious affect and racing thoughts, but intact orientation, no paranoia/delusions and fair

judgment/insight. (R. at 969.) On May 24, 2012, Cox reported that he had been applying for jobs, but it was "frustrating." (R. at 968.) He reported severe anxiety. (R. at 968.) Jacobe found that Cox had a depressed and irritable mood with anxious affect and racing thoughts, but intact orientation, no paranoia/delusions and fair judgment/insight. (R. at 968.) On June 7, 2012, Cox reported that he continued to search for work, but it was hard. (R. at 967.) Jacobe found that Cox had a depressed and irritable mood with anxious and appropriate affect, intact orientation and thought process, no paranoia/delusions and fair judgment/insight. (R. at 967.) On June 21, 2012, Cox again reported severe anxiety and decreased attention/concentration. (R. at 966.) Jacobe found Cox had a depressed mood and anxious affect. (R. at 966.) On July 12, 2012, he reported less stress since quitting his job. (R. at 964.) He further reported that he had run out of all medications, but he had received help from a church. (R. at 964.) Cox reported only mild depression and anxiety. (R. at 964.) Jacobe found that Cox had a depressed and irritable mood with anxious affect, intact orientation and thought process, no paranoia/delusions and fair judgment/insight. (R. at 964.) Jacobe's diagnoses of Cox remained unchanged. (R. at 964.)

Also on July 12, 2012, Jacobe also completed a mental assessment of Cox, finding that he had a good ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors and to understand, remember and carry out simple job instructions. (R. at 959-61.) She further found that Cox had a fair ability to deal with work stresses, to function independently, to understand, remember and carry out detailed job instructions, to maintain personal appearance and to demonstrate reliability. (R. at 959-60.) Jacobe found that Cox had a poor or no ability to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner and to

relate predictably in social situations. (R. at 959-60.) She found that his ability to maintain attention and concentration depended on his blood sugar levels. (R. at 959.) Jacobe supported these findings by stating that Cox's anxiety/social phobia impacted his ability to deal with new situations and new people, and his health issues impacted all other areas. (R. at 959.) In particular, she noted that his diabetes, anxiety, depression and self-worth issues impacted his focus and concentration, and his blood sugar levels affected his mood. (R. at 960-61.) Jacobe concluded that Cox would be absent more than two workdays monthly due to his impairments or treatment. (R. at 961.)

On July 26, 2012, Cox returned to Jacobe and continued to see her through November 13, 2012. Over this time, Cox's stressors included his mother's hospitalization, transportation difficulties, increased physical pain, difficulty obtaining his medications, some family conflict and losing his home. (R. at 1007, 1054, 1056-57.) On August 9, 2012, Cox reported severe anxiety and depression, on August 30, 2012, he reported increased symptoms of depression, and on November 13, 2012, he reported severe anxiety and severe panic attacks in crowds. (R. at 1007, 1054, 1057.) Over this time, Cox consistently had a depressed mood and anxious affect, intact orientation and thought process, no paranoia/delusions and fair judgment/insight. (R. at 1007-08, 1054-57.)

On December 6, 2012, Dr. Andrew Bockner, M.D., a state agency physician, completed a Psychiatric Review Technique form, ("PRTF"), on Cox, finding that, despite a diagnosis of depression, he was capable of all ranges of work and that any mental symptoms could not be purely attributed to a mental diagnosis. (R. at 85-86.) Thus, Dr. Bockner concluded that Cox did not have a mental medically determinable impairment at that time. (R. at 86.)

Howard S. Leizer, Ph.D., a state agency psychologist, completed another PRTF of Cox on June 14, 2013. (R. at 110-11.) Like Dr. Bockner, Leizer concluded that Cox was capable of all ranges of work and any mental symptoms could not be purely attributed to a mental diagnosis. (R. at 111.) Thus, he further concluded that no mental medically determinable impairment could be established at that time. (R. at 111.)

On February 25, 2014, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, completed a psychological evaluation of Cox, at the referral of his attorney. (R. at 1062-69, 1386-96.) Cox stated that he lived with his parents, with whom he socialized almost exclusively. (R. at 1388, 1390.) He reported working puzzles, watching television, spending some time on the internet and reading. (R. at 1063, 1390.) He reported rarely leaving home. (R. at 1063, 1390.) On mental status examination, Cox's affect was generally flat and blunt, but he was fidgety and somewhat jumpy. (R. at 1063, 1390.) He made good eye contact, and rapport was reasonably established. (R. at 1063, 1390.) Overall, his mood was described as a combination of anxiety and depression. (R. at 1063, 1390.) Cox was able to recall four of five words presented earlier, and he correctly performed Serial 7 testing. (R. at 1063, 1390.) He gave higher order and correct interpretations to two of three commonly used adages, and he correctly spelled "world" both forward and backward. (R. at 1063, 1390.) Cox displayed no clinical signs of a thought disorder, ongoing psychotic processes, delusional thinking or hallucinations of any type. (R. at 1064, 1391.) He denied suicidal or homicidal ideation, plans or intent, and he indicated no such previous attempts. (R. at 1064, 1391.) Cox reported feeling like crying or crying when alone occasionally. (R. at 1064, 1391.) He indicated that he had "pretty good" concentration and that his memory was "so-so." (R. at 1064, 1391.) He denied any significant problems with anxiety or tension

at home, but reported that he had difficulty with anxiety out in public for many years. (R. at 1064, 1391.)

Lanthorn administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), the results of which were deemed valid. (R. at 1064-65.) Cox achieved a full-scale IQ score of 92, placing him in the borderline range of intellectual functioning. (R. at 1065, 1392.) Lanthorn also administered the Minnesota Multiphasic Personality Inventory – 2, ("MMPI-2"), the results of which also were deemed valid. (R. at 1066-67, 1393-94.) This indicated a probability of serious psychological and emotional problems often characteristic of severe and chronic behavioral problems. (R. at 1066, 1393.) It further indicated that Cox was experiencing moderate to severe emotional distress and that he had a tendency to be impatient, irritable and angry. (R. at 1066, 1393.) Results indicated that Cox had difficulty with concentration, was forgetful, had memory problems, was very introverted and withdrawn from others and disliked having people around him. (R. at 1067, 1394.)

Lanthorn concluded that Cox was functioning in the average range of overall intellectual functioning. (R. at 1067, 1394.) Lanthorn noted that Cox showed the signs of social anxiety disorder. (R. at 1068, 1395.) He further noted that Cox had a distinct flattened affect and a sort of detachment and aloofness about him, leading to a diagnosis of schizoid personality disorder. (R. at 1068, 1395.) While Cox had depressive symptomotology, Lanthorn opined that it did not rise to the level of a diagnosis. (R. at 1068, 1395.) Lanthorn deemed Cox's prognosis "rather guarded," and he strongly encouraged him to continue with psychotherapeutic intervention. (R. at 1068, 1395.)

On March 5, 2014, Lanthorn completed a mental assessment of Cox, finding that he had an unlimited or very good ability to understand, remember and carry out simple and detailed job instructions, a good ability to understand, remember and carry out complex job instructions, a fair ability to follow work rules, to deal with work stresses, to function independently, to maintain attention and concentration, to maintain personal appearance, to behave in an emotionally stable manner and to demonstrate reliability and a poor or no ability to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors and to relate predictably in social situations. (R. at 1059-61, 1383-85.) Lanthorn supported these findings with Cox's diagnoses of social anxiety disorder and schizoid personality disorder. (R. at 1059, 1383.) He opined that Cox would be absent from work more than two days monthly. (R. at 1061, 1384.)

On February 17, 2014, Cox began seeing Karen Odle, a licensed professional counselor at Clinch River Health Services, Inc. (R. at 1452-54.) His presenting problems were depression and social anxiety, but he reported no prior hospitalizations. (R. at 1452, 1454.) On mental status examination, Cox was cooperative with normal motor activity, appropriate affect with depressed mood, he had normal speech and thought processes with no abnormalities of thought content, he had no suicidal or homicidal ideations, he was fully oriented, and his remote memory was impaired, but his cognitive function, abstraction, judgment and insight were intact. (R. at 1453.) When Cox returned to Odle for counseling on March 10, 2014, he reported moderate depression, mild anxiety, mild insomnia, mildly decreased appetite, moderately decreased energy, mild irritability/anger and no suicidal or homicidal ideations. (R. at 1451.) On mental status examination, Cox had a euthymic affect, intact orientation and thought process, no paranoia/delusions and good judgment/insight. (R. at 1451.) On June 9, 2014, Cox

reported moderate depression, mild hyperinsomnia, mildly decreased appetite, mildly decreased energy, mild irritability/anger and no suicidal or homicidal ideations. (R. at 1450.) On mental status examination, Cox had a depressed mood with euthymic affect, intact orientation and thought process, no paranoia/delusions and good judgment/insight. (R. at 1450.) He reported that his family environment was causing increased stress. (R. at 1450.) He also reported that he continued to transport a friend to medical appointments and other activities. (R. at 1450.)

Odle completed a mental assessment of Cox on July 2, 2014, finding that he had no limitations on his abilities to follow work rules, to function independently and to understand, remember and carry out simple job instructions. (R. at 1460-62.) She found that he was mildly limited in his abilities to maintain attention and concentration, to understand, remember and carry out detailed job instructions and to maintain personal appearance. (R. at 1460-61.) Odle found that Cox was moderately limited in his abilities to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 1460-61.) Odle also found that Cox was markedly limited in his abilities to deal with work stresses and to demonstrate reliability. (R. at 1460-61.) She opined that he would be absent from work more than two days monthly. (R. at 1462.) Odle did not specify any medical or clinical findings to support these findings.

Cox returned to Odle for counseling on July 14, 2014, at which time he reported mild depression and anxiety, mild difficulty going to sleep, mildly decreased energy and no suicidal or homicidal ideations. (R. at 1464.) Odle found that his mood was depressed with subdued affect, he had intact orientation and

thought process, no paranoia/delusions and good judgment/insight. (R. at 1464.) He reported going out with a friend on evenings working on computers. (R. at 1464.) He further reported that living at home with his parents continued to be very stressful. (R. at 1464.) Cox again saw Odle on August 18, 2014, at which time he reported moderate depression, mild insomnia, moderately decreased energy, mild irritability/anger and no suicidal or homicidal ideations. (R. at 1673.) On mental status examination, he had a depressed mood with a subdued affect, intact orientation and thought process, no paranoia/delusions and good judgment/insight. (R. at 1673.) He reported doing "ok" mentally. (R. at 1673.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2016). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2016).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that

the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if she sufficiently explains her rationale and if the record supports her findings.

Cox argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-8.) Cox also argues that the ALJ erred by failing to find that his condition met or equaled § 6.02(C)(2) of the Listing of Impairments. (Plaintiff's Brief at 8-9.)

I find that the ALJ did, in fact, err in her analysis of whether Cox's impairments met or equaled § 6.02(C)(2) of the Listing of Impairments. Although the Commissioner stated in her Brief that no such listing exists, this is only partly true. While there currently is no such section contained in the Listing of Impairments, a review of the Social Security Administration's website reveals that this Listing was in effect at the time of the ALJ's decision in this case.[9] Specifically, § 6.02 dealt with impairment of renal function, and § 6.02(C)(2) required the following:

> *Impairment of renal function*, due to any chronic renal disease that has lasted or can be expected to last for a continuous period of at least 12 months. With: … *Persistent elevation of serum creatinine* to 4 mg per deciliter (dL) (100 ml) or greater or *reduction of creatinine clearance* to 20 ml per minute or less, over at least 3 months, with one of the following … Persistent motor or sensory neuropathy. …

The record in this case shows that Cox has suffered from type I diabetes since he was at least nine years old. He has been monitored and treated continuously for his diabetes and myriad accompanying conditions during the

---

[9] Listing § 6.02(C)(2) was in effect from December 18, 2007, through December 8, 2014. *See* https://secure.ssa.gov/poms.nsf/lnx/0434126009 (last visited Sept. 20, 2017).

relevant time period. The record also shows that Cox has been diagnosed with diabetic nephropathy[10] as well as peripheral neuropathy.

The Fourth Circuit has held that an ALJ must provide an explanation for his findings from which a reviewing court may determine whether substantial evidence supports those findings. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). In *Cook*, the court held that the ALJ should have identified the relevant listed impairments and then compared each of the listed criteria to the evidence of the claimant's symptoms. *See* 783 F.2d at 1173. Likewise, in *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Fla. Power & Light Co. v. Lorian*, 470 U.S. 729, 744 (1985)), the Fourth Circuit stated that "[a] necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling…. The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence…." If the reviewing court has no way of evaluating the basis for the ALJ's decision, then 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" Here, with regard to whether Cox's conditions met or equaled Listing § 6.02(C)(2), the ALJ stated as follows: "[A]lthough suggested by the claimant's providers, the claimant has not shown that his impairments meet or equal Listing 6.02. …" (R. at 21.) The ALJ conducted no further analysis on this issue, nor did she specify the content of Listing 6.02. The ALJ offered nothing to reveal why she was making her decision, and there was no specific application of the pertinent legal requirements to the evidence of record. I find that such a conclusory and perfunctory analysis of

---

[10] Diabetic nephropathy is a serious kidney-related complication of type I and type II diabetes, which may progress to kidney failure. *See* www.mayoclinic.org/diseases-conditions/diabetic-nephropathy/home/ovc-20212103 (last visited Sept. 20, 2017).

whether Cox's conditions met or equaled this Listing, precludes this court from undertaking a meaningful review of the finding that Cox's conditions did not satisfy the Listing. Given this finding, I further find it unnecessary to address Cox's remaining argument on appeal at this time.

Based on the above-stated reasons, I find that the substantial evidence does not exist in the record to support the ALJ's finding that Cox was not disabled. An appropriate Order and Judgment will be entered remanding Cox's claim to the Commissioner for further development.

DATED:     September 20, 2017.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE